UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


JEAN-EWOLL JEAN-DENIS,[1]

               Plaintiff,

v.

                                       Case No. 3:17-cv-938-J-34JBT

LT. WAYMAN TATE and
JULIAN AVILES,

               Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Jean-Ewoll Jean-Denis, an inmate of the Florida penal system, initiated this action on August 16, 2017, by filing a pro se Civil Rights Complaint (Complaint; Doc. 1). In the Complaint, Jean-Denis asserts claims pursuant to 42 U.S.C. § 1983 against the following Defendants: (1) Sergeant Tate; (2) Sergeant Robinson; (3) Sergeant Trent; and (4) Julian Aviles,[2] M.D.[3] He asserts that Defendant Tate deprived him of meals and

---

[1] At deposition, Plaintiff stated that his first name is Jean-Ewoll and his surname is Jean-Denis. See Doc. 76-3 at 7. Accordingly, the Court will refer to Plaintiff as Jean-Denis.

[2] See Order (Doc. 28) at 1 ¶ 1 (directing the Clerk to correct Defendant's name to Julian Aviles).

[3] The Court dismissed Jean-Denis' claims against Defendants Robinson and Trent on May 31, 2018. See Order (Doc. 31).

running water while he was housed on self-harm observation status (SHOS) at Union Correctional Institution (UCI), and Defendant Aviles denied him proper medical treatment. As relief, he seeks compensatory and punitive damages.[4]

This matter is before the Court on Defendant Tate's Motion for Summary Judgment (Tate Motion; Doc. 76) and Defendant Aviles' Motion for Final Summary Judgment (Aviles Motion; Doc. 77). They submitted exhibits in support of the Motions. See Def. Exs., Docs. 75-1 through 75-4; 76-1 through 76-7; 77-1[5] through 77-6.[6] The Court advised Jean-Denis of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion to dismiss or a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the motions. See Order (Doc. 5); Summary Judgment Notice (Doc. 78). Jean-Denis filed responses in opposition to the motions. See Response to Defendant Tate's Motion for Summary Judgment (Part 1) (Response; Doc. 93); Response to Defendant Aviles' Motion for Final Summary Judgment (Response II; Doc. 94); Plaintiff's Declaration Explaining Inability to Present before the Court Additional Facts and Evidence Essential to Justify Plaintiff's Opposition to the Defendants' Summary

---

[4] The Court granted Defendants Tate and Aviles' Motions to Dismiss (Docs. 32, 33) as to Jean-Denis' requests for declaratory and injunctive relief and dismissed his claims for the requested relief. See Order (Doc. 43), filed January 14, 2019, at 7-8.

[5] Defendant Aviles submitted the wrong deposition transcript. See Aviles Motion at 2 (citing Doc. 77-1); see Doc. 76-3 (May 16, 2019 deposition transcript).

[6] The Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

Judgment Motions (Doc. 95). He also submitted exhibits. See P. Exs., Docs. 93-1; 93-2; 94-1; 94-2; 95-1 through 95-4. Defendants' motions are ripe for review.

## II. Plaintiff's Allegations[7]

In his Complaint, Jean-Denis asserts that Defendant Tate deprived him of "all meals" while he was housed in UCI's V and T dormitories on SHOS from September 16, 2013, through October 4, 2013. Complaint at 7. He describes "an unofficial policy" where officers used starvation "as a cruel tactic to force" prisoners off SHOS. Id. Additionally, he states that Tate deprived him of running water "at one point" during the relevant time period. Id. Jean-Denis avers that Defendant Aviles disregarded the urgent nature of his resulting medical needs and failed to schedule him for an appointment with an "outside" physician who could provide "specialized treatment or evaluation." Id.

The injuries Jean-Denis complains about are allegedly the result of Defendant Tate denying him meals, and Defendant Aviles depriving him of urgent medical care. According to Jean-Denis, he suffered dehydration, decreased blood sugar, and low blood pressure during the nineteen-day starvation period, and was found unconscious in his confinement cell several times. See id. at 7-8. He maintains that his stomach is "severely injured" from the starvation, and he experiences ongoing stomach pain and intolerance to most foods and drinks that are available at the prison. Id. at 8. He states that he often regurgitates after eating and has bloody vomit sometimes. See id.

---

[7] The recited facts are drawn from the Complaint, and because this matter is before the Court on summary judgment motions filed by Defendants Tate and Aviles, the Court's recitation of the facts will focus on Jean-Denis' allegations as to them.

3

### III. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rules(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[8] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v.

---

[8] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

4

Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL

(Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Arguments

In the Motions, Defendants Tate and Aviles assert that there are no genuine issues of material fact, and therefore, the Court should grant summary judgment in their favor as to Jean-Denis' Eighth Amendment claims against them. See Tate Motion at 9-16; Aviles Motion at 10-12. Aviles contends that Jean-Denis failed to comply with Florida's pre-suit requirements, and therefore, requests dismissal of Jean-Denis' state-law negligence claim against him. See Aviles Motion at 12. Tate maintains that he is entitled to qualified immunity. See Tate Motion at 13-14. Additionally, he asserts that Jean-Denis is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e) because he has not alleged any physical injuries resulting from Defendant's acts and/or omissions. See id. at 14-16. In his Response, Jean-Denis maintains that Defendants are not entitled to summary judgment in their favor because there remain genuine issues of material fact as to his Eighth Amendment claims against them. See Response; Response II.

## V. Law

### A. Eighth Amendment Deliberate Indifference

The Eleventh Circuit has explained the requirements for a claim of constitutionally inadequate care:

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones . . . ." Farmer, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[9] Thus, in its prohibition of "cruel and

---

[9] Farmer v. Brennan, 511 U.S. 825 (1994).

> unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. Id. However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating contemporary standards of decency are subject to Eighth Amendment scrutiny. Hudson, 503 U.S. at 8-9, 112 S.Ct. at 1000.[10] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. Farmer, 511 U.S. at 828, 114 S.Ct. at 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303, 111 S.Ct. at 2327.[11]

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). "A prisoner bringing a deliberate-indifference claim has a steep hill to climb." Keohane v. Fla. Dept. of Corr. Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020). "To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (quoting Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003)). First, the plaintiff must satisfy the objective component by showing that he had a serious medical need. Goebert v. Lee Cty., 510 F.3d 1312, 1326 (11th Cir. 2007).

> "A serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id.[12] (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (citation and internal quotations marks omitted).

---

[10] Hudson v. McMillian, 503 U.S. 1 (1992).

[11] Wilson v. Seiter, 501 U.S. 294 (1991).

[12] Farrow, 320 F.3d at 1243.

Brown, 387 F.3d at 1351. Next, the plaintiff must satisfy the subjective component, which requires the plaintiff to "allege that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (describing the three components of deliberate indifference as "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence.") (citing Farrow, 320 F.3d at 1245); Lane v. Philbin, 835 F.3d 1302, 1308 (11th Cir. 2016) (setting forth the three components) (citing Farrow, 320 F.3d at 1245).

> [T]he Supreme Court established that "deliberate indifference" entails more than mere negligence. Estelle,[13] 429 U.S. at 106, 97 S.Ct. 285; Farmer, 511 U.S. at 835, 114 S.Ct. 1970. The Supreme Court clarified the "deliberate indifference" standard in Farmer by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837, 114 S.Ct. 1970 (emphasis added). In interpreting Farmer and Estelle, this Court explained in McElligott that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, [14] 182 F.3d at 1255; Taylor,[15] 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

---

[13] Estelle v. Gamble, 429 U.S. 97 (1976).

[14] McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999).

[15] Taylor v. Adams, 221 F.3d 1254 (11th Cir. 2000).

<u>Farrow</u>, 320 F.3d at 1245-46. Notably, the Supreme Court has stated that a plaintiff may demonstrate the deliberate indifference of prison officials by showing that they intentionally interfered with prescribed treatment or intentionally denied access to medical care. <u>See</u> <u>Estelle</u>, 429 U.S. at 104-05.

## B. Qualified Immunity

The Eleventh Circuit has stated:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

> As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

> To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. <u>Maddox v. Stephens</u>, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." <u>Jordan v. Doe</u>, 38 F.3d 1559, 1566 (11th Cir. 1994)

(internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [plaintiff] to demonstrate that qualified immunity is inappropriate. See id. To do that, [plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified immunity defense, [the plaintiff] must satisfy both showings. Maddox, 727 F.3d at 1120-21 (citation omitted).

Jones v. Fransen, 857 F.3d 843, 850-51 (11th Cir. 2017). The Court has instructed:

Because § 1983 "requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (citation omitted), each defendant is entitled to an independent qualified immunity analysis as it relates to his or her actions and omissions. So[,] we must be careful to evaluate a given defendant's qualified immunity claim, considering only the actions and omissions in which that particular defendant engaged.

Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018).

## VI. Analysis[16]

### A. Florida's Pre-Suit Requirements
### for a Medical Malpractice Claim

Defendant Aviles contends that Jean-Denis failed to comply with Florida's pre-suit requirements, and therefore, requests dismissal of Jean-Denis' claim against him. See Aviles Motion at 12. Aviles states that Jean-Denis failed to provide "an expert affidavit of a physician in the same specialty," and therefore there is no legal basis for Jean-Denis to assert a negligence claim against Aviles. Id. The Prison Litigation Reform Act requires an inmate wishing to challenge prison conditions to first exhaust all available administrative remedies before filing an action under 42 U.S.C. § 1983. See 42 U.S.C. § 1997e(a). Additionally, as to medical malpractice claims, the Eleventh Circuit has stated:

> Florida law requires that[,] before filing any claim for personal injury or wrongful death arising from medical malpractice, the claimant conduct an investigation of the claim and send the defendant(s) a notice of intent to sue, along with a corroborating opinion by a medical expert. Fla. Stat. § 766.203(2) (2005). Attorneys must file with the claim a certificate of counsel, verifying that they have conducted a reasonable investigation and that there is a basis for a good faith belief that medical negligence occurred. Fla. Stat. § 766.104 (2005). The Florida Supreme Court has made clear that these requirements are prerequisites to suit, but not jurisdictional. Kukral v. Mekras, 679 So.2d 278, 283 (Fla. 1996). . . .
>
> Florida law mandates the dismissal of a claim for medical malpractice when the pre-suit requirements have not been fulfilled. Fla. Stat. § 766.206(2) (2005). . . .

---

[16] For purposes of summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to Jean-Denis. Thus, the facts described in the Court's analysis may differ from those that ultimately can be proved.

Johnson v. McNeil, 278 F. App'x 866, 871-72 (11th Cir. 2008).

The first step in the pre-suit investigation process is for the claimant to make a reasonable investigation to determine whether there are "grounds for a good faith belief that there has been negligence in the care or treatment of the claimant." Fla. Stat. § 766.104(1); see Fla. Stat. § 766.203(2); Weaver v. Myers, 229 So.3d 1118, 1121 (Fla. 2017) ("[B]efore filing a medical negligence action in Florida, a claimant must satisfy statutory requirements, which include conducting a presuit investigation process to ascertain whether there are reasonable grounds to believe that the defendant medical provider was negligent, and that the negligence resulted in injury to the claimant."). After completing this pre-suit investigation and prior to filing a claim, the claimant must notify each potential defendant "of intent to initiate litigation for medical malpractice." Fla. Stat. § 766.106(2)(a). The claimant must corroborate his claim with a verified written medical expert opinion, which must be furnished to each potential defendant with the notice of intent to initiate litigation. See Fla. Stat. § 766.203(2). To the extent Jean-Denis intends to bring a medical malpractice claim against Defendant Aviles, he must follow Florida's mandatory pre-suit requirements. Accordingly, Defendant Aviles' Motion is due to be granted as to Jean-Denis' medical malpractice claim because he failed to comply with Florida's pre-suit requirements.

## B. Eighth Amendment Deliberate Indifference

Jean-Denis asserts that Defendants Tate and Aviles violated his Eighth Amendment right when Tate deprived him of meals and water while he was housed on SHOS, and Aviles denied him proper medical treatment for injuries Jean-Denis sustained

12

as a result of the nineteen-day starvation and dehydration. Defendants maintain that they are entitled to summary judgment as to Jean-Denis' Eighth Amendment deliberate indifference claims against them. Pursuant to 28 U.S.C. § 1746,[17] Defendants Tate and Aviles submitted declarations in support of their summary judgment requests.[18] <u>See</u> Docs. 76-2, 76-4, Declarations of Joseph Falk (Falk Decl.) and Registered Nurse Kellie Caswell (Caswell Decl.). Defendant Tate maintains that he was not on duty in V or T dormitory where Jean-Denis was housed from September 16, 2013, through October 4, 2013. <u>See</u> Doc. 76-1, Internal Movements and Facility Housing Assignment. Assistant Warden Falk states in pertinent part:

> At the request of the Florida Office of the Attorney General, I have reviewed the approved Daily Security Rosters for Union CI from Monday, September 16, 2013 through Friday, October 4, 2013. According to the approved Daily Security Roster, Sergeant Wayman Tate was on duty at the listed posts on only the following dates and times:
>
> a. Hospital Security Sergeant on Wednesday, September 18, 2013 6:00 a.m. to 7:00 p.m.; Monday, September 23, 2013 6:00 a.m. to 6:00 p.m.; Tuesday, September 24, 2013 6:00 a.m. to 6:00 p.m.; Friday, September 27, 2013 6:00 a.m. to 6:00 p.m.;
>
> b. Housing Sergeant, D Area, on Saturday, September 28, 2013 6:00 a.m. to 6:00 p.m.; Sunday, September 29, 2013 6:00 a.m. to 6:00 p.m.; and

---

[17] A declaration under § 1746 includes the following affirmation: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)." 28 U.S.C. § 1746(2).

[18] Defendant Aviles asserts that he "incorporates … the facts and documents referenced" in Defendant Tate's Motion "as it relates to the timeline of Plaintiff's treatment and access to food and water during his time on SHOS." Aviles Motion at 6 ¶ 11.

> c. Housing Sergeant, Dorm O on Wednesday, October
> 2, 2013 6:00 a.m. to 6:00 p.m.; and Thursday, October 3, 2013
> 6:00 a.m. to 6:00 p.m.

Falk Decl. at 1 (enumeration omitted). Additionally, Nurse Caswell provides a chronology

relating to Jean-Denis' assertions concerning food and water deprivation from September

16, 2013, to October 4, 2013, based on her review of Jean-Denis' medical records. She

states in pertinent part:

> I am aware of the allegations of injury raised by inmate
> Jean-Ewoll Jean-Denis (FDC# J34720) from the above
> referenced case. The case pertains to inmate Jean Denis'
> allegations of being denied food and/or water while housed at
> Union Correctional Institution ("CI") from September 16, 2013,
> to October 4, 2013. I have reviewed the records for allegations
> of denial of food/water, failure to provide treatment, and side
> effects associated with lack of food/water.

> I have reviewed the medical records for inmate Jean-
> Ewoll Jean-Denis (FDC# J34720) for the time period at issue
> in this case, which was filed as Medical Record Attachment 1
> and consists of 389 pages.[19] It is noted that according to
> FDC procedure, when an inmate refuse[s] nine or more
> consecutive meals, it is considered a hunger strike.

> On September 1[6], 2013, Jean-Denis claimed a
> mental health emergency due to feeling of cutting, feeling
> suicidal. (Doc. 75-1 at 64-65.) On September 17th, he was
> intent on cutting or swallowing batteries. (Id., at 60-61.) On
> September 17th, lunch was checked on Mental Health Daily
> Nursing Evaluation (for 7am-3pm shift), where Jean-Denis
> ate, there were no incidents, he was cooperative, oriented,
> had normal speech, a pleasant mood, a normal affect, and a
> coherent thought process. (Doc. 75-2 at 53-54.)

---

[19] Defendants submitted Jean-Denis' mental health and medical records for the
relevant time period. Notice of Filing Medical Record Attachment for Motion for Summary
Judgment (Doc. 75); see Docs. 75-1 through 75-4; 77-2 through 77-6.

On September 18, 201[3], he ate all of his lunch and dinner. (Doc. 75-2 at 47-52.) There were no incidents to report and he consumed his lunch and dinner. (Id.) Patient had cooperative behavior, was oriented, had good eye contact, normal speech, pleasant mood, normal affect, and coherent thought process. (Id.) On September 19, 201[3], he ate his lunch and all of his dinner where there were no incident[s] to report. (Id. at 43-46.)

On September 20, 201[3], Jean-D[enis],[20] refused three meals, and initiated a hunger strike. (Id. at 37-42.) Throughout the hunger strike, the patient's vital sign[]s were monitored. He is encouraged to eat[,] but is being monitored. (Id.) He stated he is refusing to eat because he is having stomach problems and nothing is being done. (Id.) On September 21st, he refused his meals. (Id. at 33-36.) He had no complaints, was resting quietly with eyes closed, and had no other incidents noted. (Id.)

On September 22, 2013, he refused breakfast and dinner, but he ate lunch where [it] is noted on the 7am to 3pm shift he ate lunch. (Id. at 27-32.)[21]

On September 23, 2013, he refused meals, continues his hunger strike. (Id. at 23-26.) In the mental health records from September 23rd, it is noted that he stated that he wanted to buy a razor and wants to starve himself to die. (Doc. 75-1 at 50.) He is depressed and sad, is trying to get batteries to swallow, and has urges to swallow or cut himself with a razor. (Id.) Also, on September 23rd, Jean-D[enis] was interviewed, stated, "I'm not eating anything," was educated on meal consumption and the consequences of not consuming meals, the possibilities of dehydration, offered dinner, and he verbally refused, responding, "I'm good." (Id. at 48.)

On September 24, 2013, Jean-D[enis] continued to refuse all meals and stated, "I'm not drinking or eating anything … If I get peoples [sic] attention they will know what

---

[20] Defendant Tate asserts that Nurse Caswell erred when she referred to Plaintiff as Jean-Davis instead of Jean-Denis. See Tate Motion at 4 n.1.

[21] According to the Observation Checklist, Jean-Denis refused breakfast, lunch, and dinner on September 22, 2013. See Doc. 75-3 at 44.

I want done and it will be done." (Id. at 47.) Medical staff educated Jean D[enis] on the importance of nutrition. (Id.; see Doc. 75-2 at 19-22.)

On September 25, 2013, he stated "I want a painless death … I tried to drink some water … I told you that I'm suicidal." (Doc. 75-1 at 45-46; see Doc. 75-2 [at] 17-18.) He was admitted to Crisis Stabilization Unit (CSU) on September 25th. (Doc. 75-1 at 4, 8.)

On September 26th, brought to clinic because he refused to eat for seven days, skin was moist and warm, apparently is drinking, Zantac and Antacid ordered, no signs of dehydration at that time, advised to continue drinking water and to ask for medications anytime. (Id. at 41.) Jean-D[enis] inquired, "how low can your blood sugar get?" while he continued his hunger strike. (Doc. 75-2 at 11-16.) Jean-D[enis] stated that he is "not eating, and wanted to kill himself for 'awhile.'" (Doc. 75-1 at 37.) The mental health provider notes that Jean-D[enis] [was] still not eating due to suicidal idealities. (Id. at 38.)

On September 27, 2013, even though he refused meals, Jean-D[enis]' oral glucose was less than 60, so diabetes protocol was performed where he was provided glucose, raising the blood sugar level to 64 at 15 minutes. (Doc. 75-1 at 36; Doc. 75-2 at 3-10.) He stated that he will drink water and take a shower. (Id.)

On September 28th, he continued his hunger strike. (Id. at 1.) On September 29th and 30th, he continued his hunger strike. (Doc. 75-1 at 91-100.)

On October 1, 2013, Jean-D[enis] continues hunger strike, is yelling about blanket complain[t]s about officers, has his door window covered with paper, eventually removes paper with much coaxing, his skin is dry and flaky, refused liquid glucose, mucus membranes pink and moist, and blood sugar is 61. (Doc. 75-1 at 35, 85-90.)

On October 2nd, he continues hunger strike, wants to die. (Id. at 25-28, 79-84.) Nurse requests him to respond during rounds, it agitates him somewhat, dry flaky skin is noted. (Id.) He refused psych and medical meds. (Id.) An

16

order was written to use force if necessary to bring him out for evaluation and to use force to take to Urgent Care for IV fluids, lab, blood sugar 47. (Id.) He refused care in Urgent Care. Two physicians discussed the issue with Jean-D[enis], and he still refused, was making a decision, and was not psychotic. (Id.) At that time, he consumed two coffee cakes.[22] (Id.)

On October 3, 2013, unresponsive, hunger strike, eyes blinking, refused oral intake, oral glucose given. (Doc. 75-1 at 15-20, 71-78.) He stated to nurse, "I'm ok." (Id.) On October 4th, Jean-D[enis] was taken to Urgent Care. (Id. at 3-14.)

After reviewing all of the records there is no evidence that Jean-D[enis] was denied water on one day within the period of review.

After reviewing the medical records, there appears to only be a record of dehydration and low blood sugar associated with lack of food and water. The details of Jean-D[enis]' allegations of potential side effects are as follows.

Dehydration: There is documentation that the Plaintiff had dry and flaky skin during the time of his Hunger Strike.

Low blood sugar: He had low blood sugar on October 2nd, where he refused glucagon, it was monitored and his vital signs were stable, he was stable, he was coherent, he was taken to Urgent Care on October 3rd, where he was treated with IV fluids, and was provided with oral glucose. There was also a record of low blood sugar at the Reception and Medical Center on October 4th.

Low blood pressure: There is no documentation of low blood pressure.

Fainting: There is a note from September 20, 2013, where Jean-D[enis] alleges that he passed out but there are no injuries recorded or noted.

Vomiting[:] There is no documentation that the Plaintiff vomited during this time frame.

---

[22] According to a medical record, Jean-Denis _may_ have eaten coffee cake on the morning of October 2, 2013, or "maybe not." Doc. 75-1 at 25 (emphasis added).

Stomach pain: Prior to the dates for review, the Plaintiff complained of stomach pain on September 5, 2013. (Doc. 75-2 at 55.) He was assessed and had normal bowel sounds, vital signs were within normal limits and his stool guaiac was negative. (Id.)

Internal bleeding: After the dates for review, on December 23, 2013, Jean-D[enis] was seen for abdominal pain. (Doc. 75-4 at 15-16.) He complained that he had blood in stool. (Id.) His vital signs were within normal limits, his bowel sounds were present. (Id.) It is noted in the record that he has a history of swallowing hard and sharp objects (i.e., batteries and razor blades). (Id.) On January 7, 2014, he was seen at RMC in the Chronic Illness Clinic (CIC) for his "stomach." (Id.) He was diagnosed with gastritis and was given medications. (Id.)

Caswell Decl. at 1-4 (enumeration omitted).

In opposing Defendants' Motions, Jean-Denis submitted his own declarations. See P. Exs., Docs. 93-1, Declaration Supporting His Response to Defendant Tate's Motion for Summary Judgment (Jean-Denis Decl.); 94-2, Declaration Supporting His Response to Defendant Aviles' Motion for Final Summary Judgment (Jean-Denis 2nd Decl.). Additionally, he submitted the declaration of an inmate who was confined in a UCI mental health unit in 2006, 2007, and 2013. See Doc. 93-2, Declaration of Michael Noel (Noel Decl.). He also submitted Defendant Aviles' responses to his Second Set of Interrogatories. See Doc. 94-1. In a declaration, Jean-Denis describes the SHOS conditions he experienced from September 16th, through October 4, 2013, in pertinent part:

Before and at all times relevant to my civil rights complaint, the Union Correctional Institution's Crisis Stabilization and Transitional Care Units had an unofficial policy of, among several abuses, beating and starving prisoner-patients who

were on self-harm observation status ("SHOS") there, as cruel tactics to force such patients off SHOS.

In the broad majority of such cases, the starved prisoner-patients were untruthfully reported as refusing their meals and/or as being on hunger-strikes by staff.

I was on SHOS in the afore-mentioned units from September 16, 2013 through and including October 4, 2013. During that time period, Tate and a group of other officials literally deprived me of all meals, due to no fault of my own.

At one point during the said period I was even deprived of running water, on information and belief, in order to render me unable to drink.

Based on the information I was given by various medical staff, e.g., Advanced Registered Nurse Practitioner Marsha Nichols, the starvation in question caused me the injuries I reported on pages 5(b)- 5(c) of my civil rights complaint.[23]

Santa Rosa Correctional Institution ("C.I.") and Charlotte C.I. staff have lost much of my personal properties, including a copy of an incident report written by Sergeant Robinson pertaining to my supposed refusals of all meals on September 20th, 21st, and 22nd, 2013. (I received the said copy from Tate's attorney, and it was filed with the Court (supposedly) to support Tate's Motion for Summary Judgment.)[24]

Though Robinson, who was previously a Defendant in this case, wrote that I did not eat anything on the above-referenced dates, Nurse Kellie Caswell, who is Tate's witness in this case, testified under oath that I ate dinner on September 22, 2013. (Doc. 76 at 4.)[25]

This is not the only inaccuracy in Caswell's testimony. In fact, Caswell and Tate's testimonies are so inconsistent, the Court shouldn't accept such testimonies (as credible).

---

[23] See Complaint at 7-8.

[24] See Doc. 76-6 at 1.

[25] See Caswell Decl. at 2 (citing Doc. 75-2 at 27-32).

> Both Tate and Aviles, to date, have refused to produce for
> inspection and copying discoverable materials I timely
> requested since the beginning of discovery.

Jean-Denis Decl. at 2-4 (enumeration and capitalization omitted). Inmate Noel provides

the following account of his confinement in a UCI mental unit, stating in pertinent part:

> I was confined in the mental health settings at the Union
> Correctional Institution (UCI), which is a state prison in
> Florida, in 2006, 2007, and 2013. During the times of my
> confinement at UCI, the guards there had an unofficial policy
> of, among other abuses, beating, starving, and verbally
> degrading the prisoner-patients, who were on self-harm
> ob[s]ervation status (SHOS) there as a cruel tactic to force the
> said patients off SHOS.
>
> The guards at UCI's mental health settings have often beaten,
> starved, and/or verbally abused inmate-patients who were not
> on SHOS as well, when said inmates have done and/or said
> things the guards disliked, even when what the said inmates
> have done and/or said were not against prison rules or the
> law.

Noel Decl. at 2-3 (enumeration omitted). In a declaration opposing the Defendant Aviles'

Motion, Jean-Denis states in pertinent part:

> I have been treated, though inadequately, for the injuries I
> have alleged in my civil rights complaint since 2013. There are
> plenty of documentations in my medical and mental health
> records reflecting such treatments.

Jean-Denis 2nd Decl. at 2 (enumeration omitted).

At deposition, Jean-Denis testified that he was assigned to SHOS in V dormitory,

a transitional-care inpatient psych unit, where he was "very distressed" with suicidal

thoughts. Doc. 76-3, Videotaped Deposition of Jean-Ewoll Jean-Denis (P. Depo.) at 11.

He described an "unofficial policy" where the guards used starvation of the SHOS

prisoner-patients as a "tactic" to "force" inmates off SHOS because the guards felt overburdened with inmate-observation checks every fifteen minutes instead of their regular rounds every thirty minutes. See id. at 13-15; Jean-Denis Decl. at 2; Complaint at 7; see also Noel Decl. Jean-Denis states that, in "the broad majority" of situations, "the starved prisoner-patients were untruthfully reported as refusing their meals and/or as being on hunger-strikes by staff." Jean-Denis Decl. at 2. At deposition, Jean-Denis proclaimed that he "never refused any meals." P. Depo. at 38. He asserted that UCI guards deprived him of food for nineteen days. See id. at 35. According to Jean-Denis, the SHOS guards provided him with empty food trays, resulting in his thirty-pound weight loss. See id. at 22, 26, 28-31. As to water deprivation, Jean-Denis testified that the water from the cell sink (from which he drank) was turned off once for "at least 24 hours." Id. at 32-33. He surmised that "they" turned off the sink water to punish him. Id. at 34; Jean-Denis Decl. at 2-3 ("At one point during the said period I was even deprived of running water, on information and belief, in order to render me unable to drink.").

According to Jean-Denis, the nurses who attended to his medical needs provided him with proper medical care. See P. Depo. at 49. He claimed that Defendant Aviles saw the nurses' reports and should have transferred him for urgent medical care in a timely manner. See id. at 44-49, 52-53, 65. He testified that he asked Aviles to send him for urgent care "shortly" before his transfer to RMC. See id. at 53. Defendants submitted Jean-Denis' mental health and medical records in support of their assertions that mental health and medical professionals treated Jean-Denis throughout his self-declared hunger strike. In his declaration opposing Defendant Aviles' Motion, Jean-Denis states: "There

are plenty of documentations in my medical and mental health records reflecting such treatments." Jean-Denis 2nd Decl. at 2; see Response II at 10-11 ("Plaintiff's medical records ... are replete with documentations of medical staff's past and ongoing treatments of Plaintiff for injuries he alleged in his civil rights complaint.").

The chronology of events on which Jean-Denis bases his Eighth Amendment deliberate indifference claims against Defendants Tate and Aviles is as follows. According to Florida Department of Corrections (FDOC) mental health records, Jean-Denis experienced severe depression and religious hallucinations on September 16, 2013, for which the medical staff changed his medications and returned him to his cell. See Doc. 75-1 at 64-65. On September 17, 2013, he declared a mental health emergency due to hearing voices and experiencing suicidal ideations. See id. at 60-62. According to an FDOC Office of Health Services Mental Health Daily Nursing Evaluation (MHE) and Observation Checklist (OC), Jean-Denis had consumed a meal with fluids and was cooperative and coherent that day. See Docs. 75-2 at 53-54; 75-3 at 49. Additionally, MHE and OC reports reflect that Jean-Denis ate 100% of his lunch and dinner and appeared cooperative and oriented on September 18th and 19th. See Docs. 75-2 at 43-52; 75-3 at 48.

Jean-Denis complained on Friday, September 20th, that he had not eaten anything for the past several days, and that his refusal to consume food was due to "stomach problems." Docs. 75-2 at 41 (stating he had not eaten since Monday); 75-1 at 54-55 (stating he had not consumed any food since Tuesday). That same day, he refused breakfast, lunch, and dinner as well as fluids. See Docs. 75-2 at 37-42; 75-3 at 46. Nurse

Polingo noted that Jean-Denis' refusal to eat was related to his stomach issues, for which he needed to see a medical doctor. See Doc. 75-2 at 42. The staff observed Jean-Denis every fifteen minutes and documented his behavior with a "code explanation."[26] Doc. 75-3 at 46. Additionally, the nursing staff encouraged him to eat and monitored his physical and mental well-being. See Doc. 75-2 at 37-42. Jean-Denis refused all meals on September 21st. See Docs. 75-2 at 33-36; 75-3 at 45. According to the MHE report for that day, Jean-Denis "usually" consumed 100% of his daily meals, "but [was on a] hunger strike." See Doc. 75-2 at 34. According to an OC report, Jean-Denis refused all meals on September 22nd.[27] See Doc. 75-3 at 44. That same day, Sergeant Robinson wrote an Incident Report concerning the nine consecutively-missed meals. He reported in pertinent part:

> At approximately 2300 hours on September 22, 2013 while assigned as V Dorm Housing Sergeant, I was reviewing the DC6-229, Daily Record of Special Housing, when I noticed that Inmate JEAN-DENIS, **Jean-Ewoll DC #J34720 housed in V2-101 had refused the last nine consecutive meals.** [[28]] **Inmate JEAN-DENIS missed all meals between September 20, 2013 through September 22, 2013.** LPN Kirschner offered Inmate JEAN-DENIS a medical assessment to which he refused. This incident was referred to the Shift Supervisor for further disposition.

---

[26] If a corrections officer observed behavioral codes 1 (beating on door/wall), 2 (yelling or screaming), or 3 (crying), the FDOC protocol required that the officer immediately notify health care staff. See Doc. 75-3 at 46.

[27] According to the September 22nd MHE report, Jean-Denis ate lunch. See 75-2 at 30; see also Caswell Decl. at 2. Notably, Jean-Denis points out the inconsistent reports, see Jean-Denis Decl. at 3, and maintains that he did not eat for nineteen days, see P. Depo. at 35.

[28] According to Nurse Caswell, when an inmate refuses nine or more consecutive meals, it is considered a hunger strike. See Caswell Decl.

23

Doc. 76-6 at 1 (emphasis added). In his declaration, Jean-Denis is skeptical of the factual accuracy of Sergeant Robinson's Incident Report. See Jean-Denis Decl. at 3. At deposition, he maintained that guards lied when they said he refused meals. See P. Depo. at 37-39. As a result of Robinson's Incident Report, Lieutenant Kevin Adkins attempted to interview Jean-Denis that same day. He stated in pertinent part:

> I attempted to interview Inmate JEAN-DENIS concerning his refusal of the nine meals to which he refused to make a statement. Inmate JEAN-DENIS will be referred to Mental Health[.] [I]t should be noted that he is currently on SHOS. Duty Warden Colonel K. Box was notified on this incident. EAC Duty Scareno was notified at approximately 0010 hours. A copy of the DC6-229 Is attached. MINS entry #515456 was initiated and is attached. This incident was referred to the Chief of Security for further disposition.

Id. Duty Warden Colonel K. Box reviewed the Incident Report and referred the incident to the medical and mental health departments with a copy to Defendant Aviles. See id. On September 23rd, Warden Andrews stated that the medical department would "attempt" to have Jean-Denis drink a protein shake. See id. The nurses documented that the "plan" was to keep Jean-Denis in SHOS and monitor his behavior and wellness with fifteen-minute-interval observation checks. See Doc. 75-2 at 27-32.

According to FDOC medical records, Jean-Denis refused all meals on September 23rd. See Docs. 75-2 at 23-28; 75-3 at 43. The nursing staff referred him to the crisis stabilization unit (CSU), stating Jean-Denis "continues on [a] hunger strike." Doc. 75-2 at 24. According to mental health records, Jean-Denis wanted to starve himself to death and experienced urges to swallow batteries or cut himself with a razor. See Doc. 75-1 at 50, 52. The nursing staff educated him on the importance of eating meals and drinking fluids

as well as the negative consequences of non-consumption and dehydration. See id. at 48. The medical records reflect that he refused meals on September 24th, see Docs. 75-2 at 19-22; 75-3 at 42, and told the nursing staff that he was "not drinking or eating anything," Doc. 75-1 at 47. He advised the staff that his refusal to eat would "get peoples['] attention," and then "they will know what [he] want[s] done and it will be done." Id. Nurse Taylor educated him on the importance of nutrition. See id.

On September 25th, Jean-Denis refused all meals, see Docs. 75-2 at 17-18; 75-3 at 41, and proclaimed: "I want a painless death. I tried to drink some water. I told you that I'm suicidal," Doc. 75-1 at 45. A mental health counselor documented that Jean-Denis had missed "17 of 17 meals," and therefore needed to "remain on SHOS status" for close monitoring. Id. at 46. After trying to persuade Jean-Denis to eat and drink, Felix Vega, M.D., a staff psychiatrist, stated that Jean-Denis was aware of the negative consequences associated with a hunger strike. See id. at 47.

On September 26th, Jean-Denis proclaimed that he was not eating, and wanted to kill himself for "awhile." Doc. 75-1 at 37. He was examined in the clinic to assess his physical and mental wellness as a result of missing "21 meals" due to his refusal to eat for "7 days." Id. at 40-41. There were no signs of dehydration, and staff advised him to continue to drink water and take medications. See id. at 41. He asked the nurse: "how low can your blood sugar get?" Doc. 75-2 at 11. On September 27th, Corrections Officer Peugh reported the following incident:

> At approximately 0627 hours on Friday, September 27, 2013, while assigned as V Dorm Housing Officer, I was conducting my pick-up in V Dormitory on quad 2. As I approached cell V2-101, which houses Inmate JEAN-DENIS, Jean-Ewoll, DC

#J34720, I observed the Inmate JEAN-DENIS was unresponsive. I made several attempts to gain a response from Inmate JEAN-DENIS, to no avail. I initiated ICS emergency protocol. Lieutenant J. Cox, CO Nicholas Gay, Sergeant Perry Randall, and CO Chad Hope responded. This incident was referred to the Shift Supervisor.

Doc. 76-7 at 1. Shift Supervisor Lieutenant J. Cox stated in pertinent part:

I responded to the front of cell V2-101 in V dormitory. At approximately 0632 hours, with adequate staff present, and under my supervision, the cell door was breached. Officer Nicholas Gay entered the cell with the shield as a precautionary safety measure. Security staff entered the cell and Inmate JEAN-DENIS remained unresponsive. Inmate JEAN-DENIS was restrained and escorted to the V Dorm Medical Treatment room via wheelchair where he was assessed and treated by Nurse Michael Tunsil, LPN.[29] At approximately 0720 hours, Inmate JEAN-DENIS was returned to his assigned cell without incident. It should be noted that at no time was force used.

Id. The medical staff followed the FDOC diabetes protocol and gave Jean-Denis a shot of glucagon,[30] which promptly raised his blood sugar level to 64. See Docs. 75-1 at 36; 75-2 at 7. According to the medical record, Jean-Denis stated that he would drink water and take a shower. See Doc. 75-1 at 36. Nurse Hall referred him to CSU and waited for approval. See Doc. 75-2 at 4. The medical and mental health staff closely monitored Jean-Denis from September 28th through 30th. See Docs. 75-1 at 91-100; 75-2 at 1-2; 75-3 at 36-38.

---

[29] See Doc. 75-1 at 36.

[30] See Doc. 75-1 at 36 ("Due to [Jean-Denis'] refusal to take anything by mouth, [the nurse] gave [him] a shot of glucagon.").

26

Defendant Tate asserts that Jean-Denis admitted in a September 29th formal grievance that he had been on a "hunger strike" since September 17th. See Tate Motion at 7, 13. Jean-Denis discounts use of the "hunger strike" terminology, and maintains that another inmate submitted the grievance on his behalf. See Response at 3-4. He states:

> Tate claimed that Plaintiff was on a hunger strike. Such amounts to a genuine dispute. (It is true that no one reported 'starvation' in their medical, psychiatric, and/or security entries. This, however, is a no-brainer. Not only (culpable) staff have control of what goes in a prisoner's records, or files, but also said staff work in collusion. In fact, "We Never Walk Alone" is a well-known saying among the personnel of the Florida's penal system. Hence, of course, correctional staff and contractors will often cover each other's malfeasance, especially when a hierarchical supervisor is involved and at fault, or when doing what is right amounts to a conflict of interests. In addition, **another prisoner, of his own free will, filed a grievance on Plaintiff's behalf – without Plaintiff's consent – and also repeated the phrase 'hunger strike,' possibly due to his being misled by staff's misinformation.)**

Response at 3-4 (emphasis added). The facts in the formal grievance are as follows:

> This is a grievance of an "Emergency" and it is being submitted bypassing the informal grievance level due to the urgency of the actions needed to alleviate the conditions giving rise to this emergency. If I am compelled to address this matter via an informal grievance, I may be dead or my kidneys may be damaged in an irreversible manner because the Respondent is permitted 10 days to act on that level. Because this matter cannot wait even a few days, an emergency grievance is the appropriate avenue for relief. To support my position, I allege the following:
>
> Because **I have been on [a] hunger strike since Sept. 17, 2013**, most of the security officers are upset with me because it is causing them unwanted work. So[,] on or about September 28, 2013[,] one of the officers or housing supervisor turned off my sink and toilet water to punish and retaliate against me and it has been off since. Consequently,

I have not been able to drink any water since yesterday and I don't know when they plan to turn it back on, which they have refused to do thus far. Since I am being prevented from drinking water against my will, there is a great likelihood that serious or irreparable harm can result to my health or life within a few days, especially in combination with the fact that **I have not eaten in twelve days**.

I am being denied a basic necessity of life with the depriva[tion] of drinking water against my will. Said actions are in violation of my 8th Amendment right to be free from cruel and unusual punishment.

To conclude, I request that immediate actions be taken to alleviate the conditions giving rise to this emergency.

Doc. 76-5 at 2 (emphasis added). On October 2nd, S. Androlevich and Warden Diane

Andrews determined that the grievance was <u>not</u> an emergency, stating in pertinent part:

Investigation into your complaint reflects that you have not filed this DC1-303 according to Chapter 33-103.014(1)(f)&(g). Grievances of those matters which, if disposed of according to the regular time frames, would subject the Inmate to substantial risk of personal injury or cause other serious and irreparable harm to the inmate, is the definition of an Emergency Grievance, per Chapter 33-103.002(4). You have not shown that this would occur in the direct filing of this Grievance. **Sergeant Trent, V dorm Sergeant[,] was contacted and advised that you do have water in your cell and your toilet does flush. If you feel you need medical attention, contact the institutional medical department via the sick call/emergency process.** If you are within the time frames for doing such, you may resubmit your appeal utilizing the Informal Grievance Process first. If you are not satisfied with that response, you will have (15) days in which to file a Formal Grievance. Be sure to attach a copy of the Informal Grievance with the response when you file. Based on the foregoing, this grievance is returned without disposition.

<u>Id.</u> at 1 (emphasis added).

28

According to FDOC records, Jean-Denis continued his hunger strike, yelled, and complained about corrections officers on October 1st. See Doc. 75-1 at 30-33, 85-88. Dr. Springer, a psychiatrist, admitted Jean-Denis to CSU on or about October 1st, see id. at 2, 88, due to "persistent depression," gastrointestinal "distress," and hunger-strike issues, id. at 3. On October 2nd, Jean-Denis stated he "wanted to die," and refused meals, medications, and urgent care treatment. Doc. 75-1 at 24-25, 79, 81. When a nurse requested that Jean-Denis respond during observation rounds, Jean-Denis became agitated. See id. at 79-80. The medical staff instructed Jean-Denis that his multi-day hunger strike "could cause a decline in health or death," especially if he refused their urgent-care-treatment recommendation Id. at 24-25. At noon, Jean-Denis refused Ensure and stated, "I'm good, please just leave me alone." Id. at 23. According to the medical records, Defendant Aviles evaluated Jean-Denis at 12:35 p.m. See id. at 23. The medical staff consulted with another physician who agreed that Jean-Denis was not a candidate for a mental health treatment facility. See id. at 22-23. They determined that he needed "close observation." See id. at 23. On October 3rd, Jean-Denis had declined and did not want to respond when medical staff checked on him. See id. at 15-20, 71-78. He told the nursing staff that he was "okay." Id. at 77. On the morning of October 4th, Jean-Denis drank one-half of a can of Ensure, and was transferred to RMC for urgent care treatment that afternoon. See id. at 9-14.

Given the evidence submitted by Defendants, the Court finds they have met their initial burden of showing, by reference to the declarations and Jean-Denis' deposition testimony, that Defendants Tate and Aviles' conduct did not violate Jean-Denis' federal

constitutional rights. Thus, Jean-Denis is required to present evidence to show that there is a genuine issue for trial. This, he has not done. If this case were to proceed to trial, Jean-Denis would have only his testimony to support his claims,[31] and his testimony does not refute Defendants' medical and mental health evidence. Indeed, the exhibits submitted by Defendants support their position that they performed their duties in such a manner that was not violative of Jean-Denis' federal constitutional rights.

In his Complaint and declaration, Jean-Denis maintains that a group of prison officials, including Tate, deprived him of meals from September 16th through October 4, 2013. See Jean-Denis Decl. at 2; Complaint at 7. According to FDOC internal movement records, Jean-Denis was housed in V and T dormitories from September 16, 2013, through October 4, 2013, until the FDOC transferred him to the Reception and Medical Center (RMC) on October 5, 2013. See Docs. 76-1; P. Depo. at 11; see also Complaint at 7. According to Warden Falk, Defendant Tate was not on duty in V or T dormitory during the relevant time period, but instead was assigned to other areas in the facility. See Falk Decl.at 1. Nevertheless, at deposition, Jean-Denis asserted that Tate worked the day shift and came to his cell "quite a few times" during the relevant time period. See P. Depo. at 17, 63-64, 68-69. However, Jean-Denis did not recall Tate making any comments to him about food or non-consumption. See P. Depo. at 17. Additionally, he testified Tate "was on duty during more than one rotation." Id. at 68. He maintained that Tate "knew what

---

[31] Inmate Noel neither provided evidence that Defendant Tate starved Jean-Denis nor that Defendant Aviles denied Jean-Denis urgent medical care. See Noel Decl.

was going on" and "could have made a difference" if he had reported the starvation that Jean-Denis experienced while in SHOS. Id. at 62.

Assuming Defendant Tate knew that Jean-Denis had not eaten when he stopped by Jean-Denis' SHOS cell, see id. at 63, Jean-Denis has not shown that Tate was deliberately indifferent to Jean-Denis' medical and/or mental needs. Jean-Denis asserts that Tate should have reported that Jean-Denis was the victim of the starvation tactics by guards. Notably, Jean-Denis neither accused Tate of providing him with an empty tray nor coercing other guards to starve him. Indeed, FDOC officials had documented Jean-Denis' suicidal ideations as early as September 16, 2013, as well as his physical and mental issues relating to the lack of food on or about September 20, 2013. Medical professionals, including Drs. Springer, Vega, Ward, and Pages, as well as nurses and mental health clinicians closely monitored and documented Jean-Denis' behavior and wellness on a daily basis throughout the relevant time period. See Docs. 75-1; 75-2; 75-3. Corrections officers, such as Tate, undoubtedly are responsible for ensuring that inmates under their supervision are safe and secure, however, it is ultimately the medical professionals who monitor an inmate's mental and physical wellness, especially during a period of time when an inmate, such as Jean-Denis, battled suicidal ideations.[32] As to Jean-Denis' assertion that he was without water in his cell for twenty-four hours, he

---

[32] To the extent Jean-Denis asserts that Defendant Tate failed to intervene to stop the officers' starvation tactics, see P. Depo. at 62; Complaint at 5, he neither provides facts suggesting that Tate was in a position to intervene and failed to do so nor that Tate could have prevented the officers' alleged abuses. See Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010); see also Fils v. City of Aventura, 647 F.3d 1272, 1290 n.21 (11th Cir. 2011); Brown v. City of Huntsville, 608 F.3d 724, 740 n.25 (11th Cir. 2010).

testified that Tate was the one who responded to his complaint. According to Jean-Denis, Tate came to his cell door, and advised him to test the flow, at which time the water from the sink worked. See P. Depo. at 33. Given Jean-Denis' factual account, Tate's response was neither an "objectively insufficient response to that need" nor one that would cause Jean-Denis to suffer a health risk. Farrow, 320 F.3d at 1245-46.

Next, Jean-Denis asserts that Defendant Aviles denied him proper medical care. He testified that Aviles ignored the nurses' reports, see P. Depo. at 45, and failed to provide "urgent care in a timely fashion," id. at 47. He explained that the nurses were treating him, but Aviles should have provided "urgent care" or transferred him to an outside facility. Id. at 49, 52-53. The medical records reflect, and Jean-Denis agrees, that medical and mental health professionals treated him during the relevant time period. See Docs. 75-1; 75-2; 75-3. Nevertheless, Jean-Denis explains the level of care he expected from Aviles, stating in pertinent part:

> Now, it can be proven that as early as the morning of September 21, 2013, Aviles was aware of Plaintiff's serious medical needs deriving from his "hunger strike." See Doc. 75-1 at 53. Aviles stated under oath that he has been practicing medicine in the State of Florida for over forty (40) years.[33] Therefore, it is safe to infer that a medical doctor with so much experience, i.e., Aviles, would have recognized Plaintiff's then-conditions (in light of the related existing reports) constitute serious medical needs, especially when his colleagues and/or fellow multidisciplinary services team members, which included Dr. Vega, and with whom Aviles regularly conferred, as required by regulations, have recognized so. However, though Plaintiff was in need of I.V.s, among other things, which he could not receive at UCI's V dormitory, by September 25, 2013 (a fact that the record evidence proves that Aviles knew as well), and Aviles did not

---

[33] See Doc. 94-1 at 1.

> order Plaintiff's transfer to UCI's urgent care unit, which, at the time, was the only place Plaintiff could have received an I.V. and certain other specific treatments not provided in the afore-mentioned dormitory, until October 1, 2013. On information and belief, such misconduct is also in violation of the directives of the Health Services Bulletin ("HSB") which Aviles should have followed in the case at bar, as per his contract with his employer at the time. As such, the record evidence that is now before the Court clearly shows that Aviles knew of and disregarded an excessive risk to Plaintiff's health (by virtue of his then-medical conditions, which could have led to his demise) for, at least, an entire week.

Response II at 9-10 (footnote omitted).

In the Complaint, Jean-Denis asserts that he "was clearly in need of a physician's attention" after several days of starvation. Complaint at 6. According to the medical records, Drs. Springer, Vega, Ward, and Pages oversaw Jean-Denis' medical and mental health care, as he battled his physical ailments associated with missed meals as well as suicidal tendencies. See Docs. 75-1 at 29, 30, 35, 40, 44, 47, 52. It is undisputed that Aviles was aware of Jean-Denis' declining mental and physical health on or about September 21, 2020. See Response at 9 (citing Doc. 75-1 at 53). Additionally, Sergeant Robinson provided Aviles with a copy of the September 22nd Incident Report that had documented Jean-Denis' nine consecutively-missed meals from September 20th through 22nd. See Doc. 76-6 at 1. When Jean-Denis became uncooperative and refused medications on October 2nd, Dr. Springer spoke with Aviles about a transfer from CSU to an urgent care facility. See Doc. 75-1 at 25. That same day, Dr. Aviles evaluated Jean-Denis, at which time Jean-Denis asked to be transferred. See P. Depo. at 52-53; Doc. 75-1 at 23. Medical personnel closely monitored Jean-Davis until his transfer to RMC on October 4th. See Doc. 75-1 at 9-23.

To the extent Jean-Denis complains about Aviles' course of treatment, such a complaint would be at most a claim of negligence or a disagreement with Aviles' medical treatment choice, neither of which would be sufficient to state a claim of deliberate indifference to a serious medical condition. See Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991). Nor has Jean-Denis provided specific facts or medical evidence suggesting that the delay in sending him to RMC was unreasonable, especially given that medical and mental health professionals closely monitored and evaluated him through the multi-day starvation period. As to any complaints about unprofessional or negligent conduct by Defendant Aviles in providing allegedly substandard mental health and medical care, the law is well settled that the Constitution is not implicated by the negligent acts of corrections officials and medical personnel. Daniels v. Williams, 474 U.S. 327, 330-31 (1986); Davidson v. Cannon, 474 U.S. 344, 348 (1986) ("As we held in Daniels, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). A complaint that a physician has been negligent "in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Bingham, 654 F.3d at 1176 (quotation marks and citation omitted). While Plaintiff's allegations may suggest medical malpractice, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'" Harris v. Coweta Cty., 21 F.3d 388, 393 (11th Cir. 1994) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Consequently, any allegedly negligent conduct of which Jean-Denis complains does not

rise to the level of a federal constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action.

Defendants assert, and this Court agrees, that there remain no genuine issues of material fact. Jean-Denis' conclusory assertions of food and water deprivation and inadequate medical treatment do not create a question of fact in the face of contradictory, contemporaneously created medical records. See Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010) ("Although [Jean-Denis] attempts to overcome summary judgment by offering his own sworn statement[s] ... to support his allegations, the contemporaneous medical records and opinions of the examining medical [professionals] show that this purported evidence is baseless."); see Scott v. Harris, 550 U.S. 372, 380 (2007) (where a party's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").Given the strong and consistent medical and mental health records as well as Nurse Caswell's declaration and Jean-Denis' failure to provide any evidence other than his own beliefs, no reasonable jury could find for Jean-Denis under these circumstances. See Goodman, 718 F.3d at 1332 (recognizing that "to defeat a motion for summary judgment, [the plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; [t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient"). As such, Defendants' Motions are due to be granted as to Jean-Denis' Eighth Amendment claims against them.

In consideration of the foregoing, it is now

**ORDERED**:

1.      Defendant Tate's Motion for Summary Judgment (Doc. 76) and Defendant

Aviles' Motion for Final Summary Judgment (Doc. 77) are **GRANTED to the extent**

**provided herein.**[34]

2.      The Clerk shall enter judgment in favor of Defendants Tate and Aviles,

terminate any pending motions, and close the case.

3.      The Clerk shall change the docket to correct the order of Plaintiff's first and

last names as follows: Jean-Ewoll Jean-Denis.

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of April, 2020.


MARCIA MORALES HOWARD
United States District Judge


sc 4/24
c:
Jean-Ewoll Jean-Denis, FDOC # J34720
Counsel of Record

---

[34] Given the findings herein, the Court need not address Tate's assertion of qualified immunity or his contention that Jean-Denis is not entitled to compensatory and punitive damages under 42 U.S.C. § 1997e(e). See Tate Motion at 14-16. Notably, the Court previously addressed the issue of compensatory and punitive damages. See Order (Doc. 43) at 13-16.

36